# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| MILES RESOURCES LLC, | No. 847198-I |
| Appellant, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| STATE OF WASHINGTON, DEPARTMENT OF REVENUE, | |
| Respondent. | |

FELDMAN, J. — Miles Resources LLC (Miles) appeals the superior court's order affirming the final decision of the Board of Tax Appeals (Board) denying Miles' request for a tax refund. Because Miles has not demonstrated the invalidity of the Board's final decision, we affirm.

I

Miles is an asphalt manufacturer with production facilities in Washington. Miles' manufacturing division provides asphalt both to its construction division (hereinafter referred to as "internal sales") and to other entities that perform construction work (hereinafter referred to as "external sales"). While the majority of Miles' construction work during the audit period involved large public road construction (PRC) projects, Miles also performed smaller-scale projects such as paving parking lots and paving around buildings. Miles' external customers

performed similar road paving and resurfacing work, and they often used the same "mix" of asphalt—called "mix 135"—as Miles did for its PRC projects.

As a result of its different business operations, Miles pays both use tax and manufacturing business and occupation (B&O) tax.[1] Washington levies a use tax on every consumer in the state who uses any article of tangible personal property, such as self-manufactured asphalt. RCW 82.12.010(1), (7)(a); RCW 82.12.020(1); RCW 82.04.190(3). Likewise, Washington levies a B&O tax on manufacturers based on the value of their manufactured products. RCW 82.04.220(1); RCW 82.04.240.

The parties' dispute here centers on how to value the asphalt exchanged in Miles' internal sales, where no purchase or sale price exists from which to ascertain its "value" for use or B&O tax purposes. There are two prescribed ways to do so: (1) by using comparable sales of similar articles or products if available; or (2) on a cost basis if no comparable sales exist. RCW 82.04.450; RCW 82.12.010(7)(a); WAC 458-20-112. In paying use and B&O taxes on the self-manufactured asphalt it used in its PRC projects, Miles valued the asphalt on a cost basis because it claimed that no comparable sales existed.

The Department of Revenue (DOR) audited Miles for the period from November 1, 2009 through June 30, 2013. The auditor believed that the value Miles attributed to the asphalt it used in its PRC projects was not representative of the asphalt's true value for use and B&O tax purposes when compared to the prices at which it sold asphalt to its external customers. Instead, the auditor

---

[1] There are several forms of business and occupation tax in Washington. Miles paid the "manufacturing business and occupation tax," referred to herein simply as "B&O tax."

calculated the value of Miles' asphalt used in these construction projects based on the lowest price for the standard mixes on any external sale that exceeded 1,000 tons. This adjustment resulted in a tax assessment of $166,966, which included $149,064 in use tax, $7,834 in B&O tax, and $10,068 in interest.

Miles appealed the audit to DOR's Appeals Division, which referred the audit back to the Audit Division to recalculate the assessment on a job-by-job basis instead of an annual basis. After DOR's Appeals Division denied Miles' appeal from the reassessment, Miles appealed to the Board, which upheld DOR's assessment and denied Miles' request for a refund. As set forth in its detailed findings of fact and conclusions of law following an evidentiary hearing, the Board concluded that Miles failed to prove that its external sales were not comparable to its internal sales and, thus, failed to prove that DOR's assessment was incorrect.[2]

Miles appealed the Board's final decision to the King County Superior Court, which affirmed the Board's decision. Miles thereafter filed a timely notice of appeal.

II

Miles argues that the Board erred in concluding that Miles' sales to external customers satisfy the comparability elements of RCW 82.04.450(2), RCW 82.12.010(7)(a), and WAC 458-20-112. For the reasons that follow, we agree with Miles that we can properly review the Board's legal determination de novo, but we reject its argument that the Board erroneously interpreted or applied the law when

---

[2] The Board also concluded that Miles failed to establish the correct amount of tax owed under a cost basis methodology because various math errors and "uncertainties" in Miles' cost calculations rendered them "unreliable." Because we affirm the Board's comparability determination, we need not—and do not—reach Miles' argument regarding the Board's cost basis determination.

3

it concluded that Miles' external and internal sales are comparable under RCW 82.04.450(2), RCW 82.12.010(7)(a), WAC 458-20-112, and controlling case law.

A

To decide this appeal, we must first determine the proper legal standard to apply when reviewing the Board's comparability determination. Both parties agree that the Washington Administrative Procedure Act (APA), 34.05 RCW, governs this appeal because it stems from the Board's denial of a taxpayer's request for a refund pursuant to a formal hearing. *See* RCW 82.03.180. Relevant here, the APA states:

> The court shall grant relief from an agency order in an adjudicative proceeding only if it determines that:
>
> . . . .
>
> (d) The agency has erroneously interpreted or applied the law;
>
> (e) The order is not supported by evidence that is substantial when viewed in light of the whole record before the court, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this chapter;
>
> . . . or
>
> (i) The order is arbitrary or capricious[.]

RCW 34.05.570(3)(d), (e), (i). DOR argues we should apply subsection (e) and defer to the Board's decision because the key issues in this case are factual while Miles asserts we should apply subsection (d) and review the Board's decision de novo because its principal argument on appeal is that the Board erred in applying

4

the relevant tax laws to the facts. Miles also claims that the Board's decision is arbitrary or capricious under subsection (i).

We agree with Miles that subsection (d) applies here because, as Miles correctly argues, the principal issue on appeal is whether the Board erroneously interpreted or applied the law when it concluded that Miles' sales to external customers satisfy the comparability requirements of RCW 82.04.450(2), RCW 82.12.010(7)(a), and WAC 458-20-112. Subsection (e), in contrast, is inapposite because Miles does not dispute any of the Board's factual findings so they are verities on appeal. *See City of Union Gap v. Dep't of Ecology*, 148 Wn. App. 519, 525-26, 195 P.3d 580 (2008) (APA's substantial evidence standard "applies only to an agency's findings of fact"); *Darkenwald v. Emp't Sec. Dep't.*, 183 Wn.2d 237, 244, 350 P.3d 647 (2015) (unchallenged administrative findings "are treated as verities on appeal"). And lastly, as discussed *infra* at footnote 3, Miles' argument regarding subsection (i) is largely derivative of its legal arguments.

We review de novo whether Miles' external sales are comparable to its internal sales under the statutory and regulatory framework that governs use and B&O taxes. "[M]ixed questions of law and fact, also known as problems of application of law to facts, are subject to de novo review, meaning the court must determine the correct law independent of the agency's decision and then apply the law to established facts de novo." *Port of Seattle v. Pollution Control Hr'gs Bd.*, 151 Wn.2d 568, 588, 90 P.3d 659 (2004). Additionally, both parties acknowledge that the relevant tax statutes and regulations are unambiguous. Addressing the statutory and regulatory framework at issue here, the court similarly recognized in

*Texaco Refining & Marketing, Inc. v. Department of Revenue* that "[t]he statute and regulations here are unambiguous." 131 Wn. App. 385, 398, 127 P.3d 771 (2006). If the meaning of a statute or rule is plain and unambiguous, we give effect to that meaning. *See Overlake Hosp. Ass'n v. Dep't of Health*, 170 Wn.2d 43, 51-52, 239 P.3d 1095 (2010). Statutory interpretation is an issue of law, which we likewise review de novo. *Ames v. Dept. of Health, Med. Quality Health Assur. Com'n*, 166 Wn.2d 255, 260-61, 208 P.3d 549 (2009).

Lastly, we sit in the same position as the superior court, applying the APA standards to the record before the agency. *Tapper v. Emp't Sec. Dep't*, 122 Wn.2d 397, 402, 858 P.2d 494 (1993). The party asserting the invalidity of an agency action—in this case Miles—has the burden of demonstrating the invalidity of the agency action at the time it was taken. RCW 34.05.570(1)(a)-(b). Although we agree with Miles that the error of law standard in RCW 34.05.570(3)(d) applies here, Miles has not demonstrated the invalidity of the Board's action for the many reasons that follow.

B

As previewed in part I above, use tax in Washington is assessed based on "the value of the article used." RCW 82.12.020(4)(a). If an article is "extracted, produced, or manufactured" by the taxpayer or "sold under conditions wherein the purchase price does not represent the true value thereof," its value for use tax purposes is determined "as nearly as possible according to the retail selling price at place of use of similar products of like quality and character under such rules as the [DOR] may prescribe." RCW 82.12.010(7)(a). Similarly, for B&O tax purposes,

the value of an article manufactured for commercial or industrial use must correspond "as nearly as possible to the gross proceeds from sales in this state of similar products of like quality and character, and in similar quantities by other taxpayers . . . ." RCW 82.04.450(2).

DOR promulgated WAC 458-20-112 (Rule 112) to provide additional guidance on valuing those products extracted or manufactured "[f]or commercial or industrial use" or "[s]old under circumstances such that the stated gross proceeds from the sale are not indicative of the true value of the subject matter of the sale" for use and B&O tax purposes. In these circumstances, "the value shall correspond as nearly as possible to the gross proceeds from other sales at comparable locations in this state of similar products of like quality and character, in similar quantities, under comparable conditions of sale, to comparable purchasers, and shall include subsidies and bonuses." *Id.* Rule 112 then states that "[i]n the absence of sales of similar products as a guide to value, such value may be determined upon a cost basis" by considering every item of cost attributable to the article, including direct and indirect overhead costs. *Id.*

The leading case interpreting and applying Rule 112 is *Texaco Refining & Marketing, Inc. v. Department of Revenue*, 131 Wn. App. 385, 127 P.3d 771 (2006), which involved calculating the B&O tax on petroleum products. In that case, Texaco entered into exchange agreements with other refiners to avoid shipping costs. *Id.* at 390. These agreements "were barter contracts in which the partners exchanged volumes of products without listing overall price." *Id.* Because the exchange agreements did not list the overall price, DOR taxed Texaco on these

7

exchanges using daily oil price indexes known as the Oil Price Information Service (OPIS) and Platts Oilgram (Platts). *Id.* at 391-92. Texaco argued that the OPIS and Platts market was not comparable to the exchange contracts because they involved different quantities, conditions of sale, purchasers, and locations. *Id.* at 392, 400. Thus, Texaco argued, the tax should be assessed based on its internal valuations of the exchanged petroleum products rather than comparable sales reported by OPIS and Platts. *Id.*

The court in *Texaco* aptly summarized the hierarchy of appropriate methodologies for valuing a product under Rule 112. *Id.* at 396. The court began by noting that "true value" means the "fair market value," which in turn means "the amount that a willing buyer would pay a seller who is not obligated to sell." *Id.* (citing *U.S. Tobacco Sales & Mktg. Co. v. Dep't of Revenue*, 96 Wn. App. 932, 940, 982 P.2d 652 (1999)). The court rejected Texaco's internal costs as a measure of market value because the "internal cost numbers do not measure the price a willing buyer would be willing to pay; they measure only at what price Texaco might sell." *Id.* at 396-97. Therefore, DOR was required to "look for comparable sales to value the product" and could properly determine the value based on production costs only in the absence of such sales. *Id.* Citing WAC 458-20-112, the court confirmed that a "comparable sale" is one to "(1) comparable purchasers (2) at comparable locations (3) under comparable conditions of sale and (4) involve similar quality products (5) in similar quantities." *Id.* at 398-99. The court stressed that the comparison "need not be exact, but rather 'as nearly as possible.'" *Id.* at 399 (quoting RCW 82.04.450(2)).

On the comparator of quantity, Texaco argued that OPIS and Platts market prices were not comparable to the exchange agreements because the former were based on daily sales up to 50,000 barrels while the latter involved millions of barrels in total. *Id.* at 402. The court disagreed, reasoning that some of Texaco's exchanged products were within the range of the OPIS and Platts volumes when organized by daily and monthly deliveries and by product. *Id.* at 403-04. The court noted, "Some of the spot agreement volumes are larger, up to four times larger than the typical OPIS and Platts volumes. But only some of the product volumes were large enough to exceed OPIS and Platts, and that is not sufficient to render these pricing indexes incomparable to the exchanges." *Id.* at 404.

On the comparators of purchasers and conditions of sale, Texaco argued the market surveyed by OPIS and Platts did not address the type of large scale, long term contracts as the barter exchanges. *Id.* at 400, 405. The court disagreed, reasoning that OPIS and Platts surveyed the same refiners involved in the barter exchanges, including Texaco, and the only difference was the size of the overall contract. *Id.* at 405. The *Texaco* court ultimately concluded that the OPIS and Platts market was comparable to Texaco's exchange agreements because it satisfied all five comparators of Rule 112. *Id.* at 400-01. Therefore, DOR's assessment of the exchanged petroleum products based on a comparable sales methodology was proper. *Id.* at 406.

Applying these legal principles here, Miles' external sales are comparable to its internal sales under RCW 82.04.450(2), RCW 82.12.010(7)(a), and Rule 112. As to the comparability of purchasers, some of Miles' largest external customers'

primary business activity was highway, street, and bridge construction. Although Miles primarily used its internal asphalt for PRC jobs, it used several hundreds of thousands of tons of asphalt in retail and wholesale jobs—the same type of smaller jobs performed by Miles' largest external customers. Additionally, Miles' external customers bought the same kind of mixes that Miles used in its construction projects, including mix 135, which is the mix approved by the Washington State Department of Transportation for public road construction. The two largest customers during the audit period, Lakeridge Paving Company, LLC and Pierce County Road District #2, together purchased over 225,000 tons (approximately 15 percent of total tons produced) of asphalt from Miles. Furthermore, some of Miles' external customers also hired Miles to perform construction work, indicating some overlap between internal and external sales. Thus, the Board did not erroneously interpret or apply the law when it concluded that Miles' external customers are comparable purchasers to Miles.

As to conditions of sale, when looking at Miles' construction division as if it were a purchaser, it acquired asphalt in a similar manner to Miles' largest external purchasers. During the audit period, Miles' largest customers paid for asphalt at a flat, discounted rate. Many of Miles' largest customers have an account with Miles and are invoiced after they pick up the material. Some of Miles' external customers ordered asphalt weeks in advance of picking it up from Miles, which resembles how Miles controlled its schedule for producing asphalt for its PRC projects. Therefore, the Board did not erroneously interpret or apply the law when it concluded that the conditions of Miles' external and internal sales are comparable.

As to quantity, although most of Miles' construction projects used larger volumes of asphalt than the volumes it sold to external purchasers, some of Miles' smaller projects used volumes well within the range of its external sales. Specifically, some of Miles' PRC projects required fewer than 1,000 tons of asphalt, while some of Miles' largest external customers purchased more than 1,000 tons of asphalt in a single order. This resembles the comparable quantities in *Texaco*, where the volumes of some of Texaco's daily and monthly exchanges fell within the amounts surveyed by OPIS and Platts. 131 Wn. App. at 402-04. DOR also accounted for the difference in quantities between external and internal sales by ignoring Miles' smaller external sales and instead using the lowest price for the standard asphalt mixes on any external sale that exceeded 1,000 tons. On this record, the Board did not erroneously interpret or apply the law when it concluded that the quantities of asphalt involved in Miles' external and internal sales are comparable. The fifth and final comparator, like the others, is satisfied here.

Notwithstanding the above analysis, Miles argues its internal and external sales cannot be comparable because they involved vastly different quantities of asphalt. While that may be true when comparing *average* quantities across all internal and external sales, the DOR auditor calculated the value of Miles' asphalt based on the lowest price for the standard mixes on any *individual* external sale that exceeded 1,000 tons. DOR also presented evidence to the Board that the price per ton of asphalt did not vary much by the size of the purchase among Miles' largest customers. Instead, these customers were effectively purchasing asphalt at amounts close to Miles' production costs. Here, as in *Texaco*, the stated

differences between the internal sales and the external sales that DOR used to determine value are not sufficient to render the external sales incomparable. 131 Wn. App. at 404.

Miles also argues that its internal sales cannot be compared to its external sales because "the 'customer' using Miles' asphalt products for Miles' public road construction projects was Miles itself . . . ." This argument ignores the purpose of the tax laws at issue, which is to value an article in situations where no purchase or sale occurs, such as when the manufacturer uses the article and thus "sells" it to itself. RCW 82.04.450(1)(b); RCW 82.12.010(7)(a); WAC 458-20-112. Miles acknowledges it is impossible to ascertain the purchase or sale price of this asphalt by looking to the market because PRC firms do not purchase large volumes of asphalt from competitors. Consequently, the only available comparison for determining a use and B&O tax valuation for Miles' internal use of asphalt products was Miles' external sales of the same asphalt products. This comparison was appropriate under the circumstances.

Next, citing LAWS OF 2023, ch. 307 § 2, SHB 1764, §§ 2-3, Miles argues that the legislature recently amended RCW 82.04.450 and RCW 82.12.010 to provide that the value of asphalt manufactured or extracted by a taxpayer performing public road construction shall be "equal to the sum of all direct and indirect costs attributable to the asphalt or aggregates used, plus a public road construction market adjustment of five percent of those costs." But this amendment to the tax statutes clearly states that it "applies prospectively only to tax liability incurred as a result of contracts executed on or after" its effective date of August 1, 2023. *Id.*

at §§ 4-5. Miles incurred its disputed tax liability between 2009 and 2013, and the issue here is whether DOR properly valued the asphalt during the tax period in question under the laws then in effect. *See* RCW 34.05.570(1)(b) ("The validity of agency action shall be determined in accordance with the standards of review provided in this section, as applied to the agency action *at the time it was taken*." (Emphasis added)). Had the legislature intended this change to apply retroactively, it would have so stated.

Lastly, Miles argues that DOR's online guidance directed taxpayers engaged in manufacturing asphalt for use in public road construction to value the asphalt on a cost basis. To support this argument, Miles points to a now defunct webpage stating that the "taxable value is equal to all costs incurred to produce the asphalt, including labor and overhead." This argument is unconvincing because Washington's tax statutes and regulations govern over DOR's informal tax guidance. *Dynamic Res., Inc. v. Dep't of Revenue*, 21 Wn. App. 2d 814, 823, 508 P.3d 680 (2022). Nor does Miles present any evidence that it detrimentally relied on this online guidance in paying use or B&O taxes on the disputed asphalt.

In sum, the Board did not erroneously interpret or apply the law, including RCW 82.04.450(2), RCW 82.12.010(7)(a), and WAC 458-20-112, in concluding that comparable sales exist from which to value the asphalt Miles used in its PRC projects during the audit period. DOR compared Miles' internal sales of asphalt "as

nearly as possible" to the closest available external sales. Accordingly, Miles has not demonstrated that the Board's final decision is invalid.[3]

III

For the above reasons, we affirm the Board's final decision and, accordingly, affirm the trial court's decision on judicial review.

_Feldman, J._

WE CONCUR:

_Colwn, J._                    _Hazelrigg, ACJ_

---

[3] Because we affirm the Board's determination applying de novo review, we would similarly affirm applying a deferential standard as DOR argues we should. For the same reasons set forth in the text above, the Board's order is also supported by substantial evidence under RCW 34.05.570(3)(e). Miles also claims that the Board's decision is arbitrary or capricious under RCW 34.05.570(3)(i) because it concluded that "the substantially smaller external sales to third-party customers were 'comparable enough' to Miles' internal use of asphalt for public road construction, without further explanation." Under RCW 82.04.450(2), RCW 82.12.010(7)(a), Rule 112, and controlling case law, the comparison "need not be exact, but rather 'as nearly as possible.'" _Texaco_, 131 Wn. App. at 399 (quoting RCW 82.04.450(2)). An agency action is arbitrary or capricious if it "is willful and unreasoning and taken without regard to the attending facts or circumstances." _Port of Seattle_, 151 Wn.2d at 589. As the above discussion shows, that demanding standard is not satisfied here.